**Arthur Paul BAIRD, II, Appellant–Petitioner,**

**v.**

**STATE of Indiana, Appellee–Respondent.**

**No. 54S00–9304–PD–434.**

Supreme Court of Indiana.

Dec. 2, 1997.

Rehearing Denied March 2, 1998.

Jessie A. Cook, Terre Haute, for Appellant–Petitioner.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Assistant Attorney General, Indianapolis, for Appellee–Respondent.

BOEHM, Justice.

Arthur Paul Baird, II appeals from a denial of his petition for postconviction relief. In 1987, Baird was convicted of the 1985 murders of his wife and parents and of feticide. Baird's petition for postconviction relief unsuccessfully raised nine issues. In this appeal Baird alleges that the postconviction court erred as to four of those issues. He contends that: 1) the sentence of death was excessive, disproportionate, or inappropriate; 2) the Indiana Insanity Defense Statute violates the federal and Indiana constitutions; 3) his trial counsel committed fundamental error by failing to strike for cause, or interrogate, jurors that had been exposed to information concerning plea negotiations, and in failing to move for a mistrial because of an impartial jury; and 4) the trial court's decision to excuse a prospective juror pursuant to the Indiana Householder Statute was fundamental error. We affirm the judgment of the postconviction court.

### Factual and Procedural Background

The facts of this case are reported in *Baird v. State,* 604 N.E.2d 1170, 1175–76

(Ind.1992). In brief, on the evening of September 7, 1985, Baird strangled his wife as she lay in bed in the trailer on the farm where they lived. The next morning, as he usually did, Baird fed the chickens and brought in the newspaper for his parents who lived nearby on the farm. Shortly after his mother gave him a haircut, he stabbed and killed her. As Baird was leaving the house, he encountered his father and stabbed and killed him. Baird packed his car, drove away, and was apprehended about five hours later as he sat in the bleachers watching a softball game. He left behind notes and letters whose content was mixed with remorse and regret for his actions and concern for the loose ends of his daily routine, such as taking care of the recycling, leftover food items, and bills. In a detailed statement to police, Baird confessed that he had totally lost control and gone "berserk." At trial, evidence was introduced that Baird believed the federal government was about to pay him one million dollars in return for his advice, never given, on how to solve the national debt. Expecting this money, Baird, with his wife, had made plans to purchase a large farm. The murders occurred the day before the scheduled closing. Baird contended that he did not act voluntarily and that he was insane at the time of the killings.

■ The jury found him guilty of three counts of murder and one count of feticide. Following the jury's recommendation the trial court imposed the death sentence as to the murders of Baird's parents, and also imposed a sixty year sentence on the remaining murder charge, and an eight year sentence for the feticide. In 1992, we affirmed the convictions and the sentence on direct appeal. *Baird,* 604 N.E.2d at 1170. Baird then petitioned for postconviction relief. After a hearing, the postconviction court denied Baird's petition. Pursuant to Indiana Postconviction Rule 1(7), this appeal followed. The standard of review in postconviction proceedings is governed by Indiana Trial Rule 52(A). *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995), *reh'g denied.* To succeed on an appeal from a negative judgment in postconviction proceedings, "the appellate tribunal must be convinced that the evidence as a whole was such that it leads unerringly and

unmistakably to a decision opposite that reached by the trial court." *Id.* (citing *Williams v. State,* 508 N.E.2d 1264, 1265 (Ind.1987)). We defer substantially to findings of fact but not to conclusions of law. *State v. Moore,* 678 N.E.2d 1258, 1261 (Ind. 1997).

## I. Death Sentence

■ Baird contends in this appeal that the postconviction court erred in not concluding that the death sentence was excessive, disproportionate, or inappropriate under the Eighth and Fourteenth Amendments to the U.S. Constitution. He also requests that we remand for new sentencing in light of newly discovered evidence that bears on this conclusion. The source of the new evidence was testimony at the postconviction hearing by Dr. Howard E. Wooden, a clinical psychologist. Dr. Wooden testified that at the time of the murders Baird suffered from a "delusional disorder" accompanied by a "psychotic reaction." According to Wooden's diagnosis, Baird acted and functioned in accordance with fanciful beliefs or delusions. The wisdom of Baird's illusory belief system was threatened by a different tangible reality— the failure of the federal government to supply funds to purchase the new farm. He refused to confront this reality and snapped, murdering his family—the accompanying psychotic reaction. Dr. Wooden said that at the time of the trial, such delusional disorders were not available for firm independent diagnosis but were considered mainly in conjunction with substance abuse. Baird does not assert that this evidence required a finding of not guilty by reason of insanity. Rather, his contention is that if this diagnosis had been available to present to the jury in the sentencing phase or to this Court on direct appeal, it would have established Baird's inability to control his behavior and thus changed the balancing of mitigating and aggravating factors to weigh against a death sentence.

■ After hearing Dr. Wooden's testimony, the postconviction court found that there was "no evidence" that the death sentence was excessive, disproportionate, or inappro-

priate. The postconviction court also concluded that because Baird raised this claim on direct appeal, it was barred by res judicata. The court correctly concluded that we previously decided the issue adversely to Baird on direct appeal. *Baird,* 604 N.E.2d at 1181–83. However, the postconviction court did not allude to Baird's new evidence claim. Presumably, this is because in his postconviction petition, Baird did not characterize his objection to the death sentence as a new evidence claim. Nor did he refer to Indiana Postconviction Rule 1(1)(a)(4).[1] Rather he asserted that the death sentence should be reconsidered and offered Dr. Wooden's testimony as the reason. On appeal, Baird makes the same claim that the death penalty should be reconsidered but specifically asserts that Dr. Wooden's testimony was new evidence providing the factual basis for his argument, though again without mentioning Rule 1(1)(a)(4). An appellant may not state one ground for his position at trial and assert another ground on appeal. *Jester v. State,* 551 N.E.2d 840 (Ind.1990). Even if viewed as newly discovered evidence, however, Baird's claim fails on the merits.

In order to obtain relief because of newly discovered evidence, the defendant must show that (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced on a retrial of the case; and (9) it will probably produce a different result. *James v. State,* 613 N.E.2d 15, 25 (Ind.1993) (citing *Nunn v. State,* 601 N.E.2d 334, 336–37 (Ind.1992)).[2] Dr. Wooden's testimony does not meet this standard because it is cumulative and because it does not establish a prob-

ability that had his diagnosis been available and made at trial, there would have been a different result.

After Baird filed notice of the defense of mental disease or defect, three psychiatrists were appointed to examine Baird as court's witnesses. In trial testimony or by deposition admitted into evidence, the psychiatrists variously described him as "obsessive compulsive," as acting "on an impulse" in the murder of his wife, and even as psychotic and legally insane. In addition, an expert for the defense, who testified by video deposition during sentencing, concluded that although Baird knew what he was doing at the time of the murders, he could not control his conduct. None of the above diagnoses is termed a "delusional disorder" but in substance, as Baird notes in his brief, each of the experts who examined Baird described him as volitionally impaired, and one psychiatrist even shared Wooden's later view that Baird was "obsessive compulsive." Baird argues that his behavior was inexplicable without knowledge of the disassociative phenomena resulting from the psychotic break with his fictional world. He describes the earlier experts' attempts to evaluate his behavior as relevant mainly just to show Baird's above average frustration and stress, weak self-image, and primitive thinking.

Baird's description understates each expert's claim. Indeed, one of these experts declared at trial that Baird was insane and psychotic. Further, Dr. Wooden's testimony is not based on any new facts previously unknown to the experts or the jury. As already noted, Baird's expectation that the federal government was going to pay him one million dollars and his plan to buy a farm with that money were discovered shortly after the murders and introduced into evidence at trial. Thus, even if the jury, and this

---

1. This rule provides that the postconviction remedy is available to: "(a) Any person who has been convicted of, or sentenced for, a crime by a court of this state, and who claims ... (4) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Ind. Post–Conviction Rule 1(1)(a)(4).

2. This standard was originally formulated under former Indiana Trial Rule 59(A)(6) which set out

newly discovered material evidence as a ground for a motion to correct errors. *Wiles v. State,* 437 N.E.2d 35, 39 (Ind.1982) (citing *Tungate v. State,* 238 Ind. 48, 54–55, 147 N.E.2d 232, 235–36 (1958)). In 1990 the Rule was amended in nonmaterial respects and is currently Rule 59(A)(1). The decisional law construing the newly discovered evidence standard was not affected by this change.

Court on direct appeal, did not know that "delusional disorders" as such existed, each was equipped with the facts of Baird's bizarre conduct and with the psychiatrists' conclusions that Baird was volitionally impaired. Dr. Wooden's testimony simply does not mandate a new interpretation of the facts. He offers another, perhaps more medically advanced opinion, but an opinion that significantly overlaps with those already proffered. We do not exclude the possibility that a scientific breakthrough may generate post-trial evidence that justifies revisiting the findings of an earlier jury or an earlier sentence. But any such scientific evidence must meet not only the standard of Indiana Evidence Rule 702, but also that of Trial Rule 60, including that it was not available at the time of trial, was not cumulative, and also rises to the level of creating a "probability" of a different result. We assume that cases turning on evidence that meets the standard of both rules will be rare. This is not one of them. The testimony to which Baird points is cumulative not pathbreaking and provides no assurance that a different result would probably have been reached. Accordingly, Baird's claim that the death sentence was excessive, disproportionate, or inappropriate is barred by res judicata, and the standard for revisiting the issue based on new evidence is not met.

## II. Constitutionality of Insanity Statute

■ Baird's conduct, as set forth in detail in his direct appeal, evidenced a clear understanding of the nature of his actions and efforts to deceive others to implement them. *Baird,* 604 N.E.2d at 1175–76. Nonetheless, Baird contends that the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution as well as Article 1, §§ 12 and 13 of the Indiana Constitution establish a defense of insanity as a matter of constitutional law and that his delusions meet the requirements of the constitutionally mandated defense. More specifically, he contends that Indiana's statutory definition of insanity, IND.CODE § 35–41–3–6 (1993), is unconstitutional because it fails to define volitionally impaired defendants—or those who acted in accordance with an "irresistible impulse"—as insane. Indiana's statute, since 1984, has had no such definition of insanity.[3] Because Indiana's definition of insanity is similar in this respect to the federal definition and that of many states, Baird's argument is in effect a challenge to the constitutionality of all statutes that omit "irresistible impulse" as a form of insanity defense.

■ The postconviction court concluded that Baird's unconstitutionality argument was barred by res judicata because Baird had raised the issue and lost on direct appeal. On direct appeal, we dealt with a different constitutional argument and held that the insanity statute did not unconstitutionally shift the burden of proof of mens rea to the defendant. *Baird,* 604 N.E.2d at 1177–78. Also on direct appeal, Baird argued that evidence of irresistible impulse provided a factual basis that was sufficient to require the State to prove that Baird acted voluntarily pursuant to the statutory voluntary act requirement, Indiana Code § 35–41–2–1(a). *Id.* at 1176–77. Although these claims share Baird's current concern about the voluntariness of his action, his current challenge is substantively different from either of these two claims. In this postconviction proceeding, he directly attacks the validity of the insanity definition itself. His argument is therefore not barred by res judicata because it is not a duplicate

---

3. In the wake of John Hinckley's assassination attempt on President Reagan, Congress passed legislation defining insanity, and several states modified their definitions of insanity, to exclude the volitional prong. *See generally* 118 A.L.R. FED. 265 (1994 & Supp.1996); 2 PAUL H. ROBINSON, CRIMINAL LAW DEFENSES § 173(a) (1984 & Supp.1997). Since 1984, Indiana Code § 35–41–3–6 has set out the insanity defense as follows: "(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." The volitional prong, also sometimes called "irresistible impulse," was deleted from the insanity definition in 1984. This prong included the inability "to conform ... conduct to the requirements of law" as insane behavior. 1976 Ind.Acts, P.L. 148, § 1; 1977 Ind.Acts, P.L. 340, § 11. The federal statute defines the defense as available if "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17 (1988).

of any issue he raised on direct appeal. However, Baird's latest constitutional argument was available on direct appeal. Accordingly, for purposes of postconviction review, the issue is waived. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind.1993) (issues which were or could have been raised on direct appeal are not available for review in postconviction proceedings).[4]

### III. Juror Exposure to Plea Negotiations

■ Next, Baird requests a new trial because, he contends, the postconviction court erred in concluding that Baird received a fair trial under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1, §§ 12 and 13 of the Indiana Constitution. He claims that four members of the jury were not impartial because they had been exposed to information derived from media accounts of plea negotiations that Baird had participated in before jury selection.

During voir dire, prospective jurors were interviewed in panels of three. The subject of Baird's plea negotiations was mentioned to three different panels when future seated jurors were present. For example, while two jurors were present, a prospective juror stated that he had read or heard that Baird had pleaded guilty and that he would find it hard to put out of his mind. That prospective juror was excused. The court responded by asking the other two whether, despite this knowledge, they could give Baird the benefit of a presumption of innocence. Each responded in turn that they thought they could. In order to be sure, the court stressed the importance of paying attention only to the evidence presented in court and elicited affirmative responses from both jurors, indicating that they understood. The other examples of alleged juror contamination are similar.

■ As the postconviction court noted, we considered a similar, if not the same question on direct appeal. *Baird*, 604 N.E.2d at 1185–86. There, we observed that

the trial court thoroughly questioned each prospective juror as to the details of news reports that they may have recalled and admonished them that their verdicts must be based on the evidence produced at trial. Each juror impaneled expressed that they could try this case on the evidence, put aside any prior opinions they might have formed, and give the defendant the presumption of innocence.

*Id.* at 1186. If Baird's current claim was not raised on direct appeal—and addressed by the quoted paragraph—the issue was certainly available and therefore presumably waived. To deal with that problem, Baird now characterizes his impartial jury claim as fundamental error. "Fundamental error" has been permitted to preserve certain egregious claims of error even if they were not objected to or were available but not raised on appeal. *Perkins v. State*, 541 N.E.2d 927, 929 (Ind.1989); *Bailey v. State*, 472 N.E.2d 1260, 1263 (Ind.1985). In Baird's case, it is not clear that error occurred at all, but surely any error cannot be viewed as fundamental. Mixed with the contention of fundamental error is a contention that Baird's trial counsel rendered ineffective assistance by failing to object to the seating of some of the allegedly contaminated jurors. However, counsel heard each juror declare his or her openminded intentions to the court. It is quite plausible that counsel's "failure" to interrogate or move to strike these jurors was based on a conscious decision that the jurors were desirable from the defense point of view. Accordingly, this claim, to the extent it is not barred by res judicata, does not present a fundamental error, particularly because the entire defense at both guilt and penalty phases focused not on whether Baird committed the killings, but rather on his sanity. Nor does the claim raise a serious contention of ineffective assistance of counsel.

### IV. Excused Juror Under Householder Statute

■ Finally, Baird contends that the trial court erred in excusing a juror pursuant to

---

4. Although we do not reach the merits of Baird's constitutional argument, we note that the Eleventh Circuit found the federal insanity statute constitutional in *United States v. Freeman*, 804 F.2d 1574, 1577 (11th Cir.1986) and that the

current federal and Indiana definitions of insanity mimic the "M'Naghten" rule, a well established, if controversial, legal definition of insanity since the mid 19th century. *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843).

the requirement, since repealed, that a juror be a "householder." IND.CODE § 33–4–5–7 (1993) (repealed by 1989 Ind.Acts, P.L. 282, § 2). This, he claims, resulted in violation of both his federal Sixth Amendment and Indiana constitutional right to be tried by a jury composed of a representative cross section of the community.[5] Specifically, Baird argues that the trial court's application of the householder statute to the venire was unconstitutional. The statute provided that a qualified juror must be "a freeholder or householder, or the spouse of a householder," meaning that jurors should "be actual members of the community [with] the experience of making important and binding practical decisions . . . independently of family or relatives or others." *Stevens v. State,* 265 Ind. 396, 401, 354 N.E.2d 727, 731 (1976).[6] During voir dire, the trial court more narrowly defined a householder as a person who, with or without a spouse, was independent, self supporting, and maintained his or her own home. He then excused a juror who said she was unemployed and financially dependent on and living with her mother.

Although Baird neither objected to the trial court's action at trial, nor raised this claim on direct appeal, Baird argues that the error was "fundamental" and therefore not waived. *James,* 613 N.E.2d at 25. Generally, an error is "fundamental" if it is so prejudicial to the rights of a defendant that it makes a fair trial impossible. *Barany v. State,* 658 N.E.2d 60, 64 (Ind.1995). Even if we were to assume that the trial court misconstrued the householder requirement, and that this error implicated Baird's Sixth Amendment rights, the resulting error is not necessarily fundamental. As we said in *Wilson v. State,* 514 N.E.2d 282, 284 (Ind.1987), "[m]erely because an error relates to a violation of a constitutional right does not, in and of itself, render it fundamental error. . . .

[T]he error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." Baird's contention does not meet this standard. He makes no showing as to how the exclusion of one juror from the venire resulted in any harm that would affect the trial one way or the other. To the extent exclusion from the jury violated the juror's rights (as opposed to the defendant's) any error cannot be viewed as fundamental. *Cf. Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). The issue is waived. *Weatherford,* 619 N.E.2d at 917.

### Conclusion

We affirm the judgment of the postconviction court.

SHEPARD, C.J., and DICKSON and SELBY, JJ., concur.

SULLIVAN, J., concurs in Parts I and II and concurs in result in Parts III and IV.

---

**5.** The cross sectional requirement of the Sixth Amendment is binding on the states under the Fourteenth Amendment. *Taylor v. Louisiana,* 419 U.S. 522, 526, 95 S.Ct. 692, 695–96, 42 L.Ed.2d 690 (1975); *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447–48, 20 L.Ed.2d 491 (1968).

In asserting his Indiana constitutional right, Baird cites §§ 12, 13, 16, 18, and 23 of the Indiana Constitution. However, Baird provides no authority or argument for a separate and independent Indiana constitutional standard. Thus, the state constitutional claim is waived. *St. John v. State,* 523 N.E.2d 1353, 1355 (Ind. 1988).

**6.** In *Wooten v. State,* 418 N.E.2d 538, 540 (Ind. Ct.App.1981), the Court of Appeals held that the statute, construed to require "maturity" in jurors, was constitutional.